Pages 1 – 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

ROBERT J. LANG, NOBURU MIYAJIMA,   )
MANUEL SIRGO, NICOLA BANDONI,      )
TOSHIKAZU KAWASAKI, and JASON KU,  )
                                   )
          Plaintiffs,              )
                                   )
  vs.                              ) NO. C 11–01366 EMC
                                   )
SARAH MORRIS,                      )
                                   )  San Francisco, California
          Defendant.              )  Thursday
                                   )  September 8, 2011
_____)  10:08 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs**        Bay Oak Law
                          180 Grand Avenue, Suite 700
                          Oakland, CA 94612
                          (510) 208–5500
                     BY:  **ANDREW K. JACOBSON**
                          **LAURA KOCH**

**For Plaintiffs**        Haims Valentino, LLP
                          180 Grand Avenue, Suite 700
                          Oakland, CA  94612
                          (510) 835–0500
                          (510) 835–2833 (fax)
                     BY:  **CAROLINE N. VALENTINO**


(Appearances continued on next page)

Reported by:     Lydia Zinn, CSR #9223, RPR, CRR
        Official Reporter – U. S. District Court

Lydia Zinn, CSR,  RPR
Official Reporter –  U.S. District Court
(415)  531–6587

APPEARANCES CONTINUED

**For Defendant**                Cowan, Liebowitz & Latman, P.C.
                                 1133 Avenue of the Americas
                                 New York, NY  10036-6799
                                 (212) 790-9200
                                 (212) 575-0671 (fax)
                          BY:    **ROBERT W. CLARIDA**

**For Defendant**                Fitzgerald Abbott & Beardsley, LLP
                                 1221 Broadway, 21st Floor
                                 Oakland, CA  94612-1837
                                 (510) 451-3300
                                 (510) 451-1527 (fax)
                          BY:    **DAVID C. LEE**

**THE CLERK:**  Please be seated.  Calling Case C. 11-1366, *Lang versus Morris*.

Counsel, please come to the podium and state your name for the record.

**MR. JACOBSON:**  Good morning, your Honor. Andrew Jacobson, on behalf of the plaintiffs.

**THE COURT:**  All right.  Thank you, Mr. Jacobson.

**MR. CLARIDA:**  Robert Clarida, of Cowan, Liebowitz & Latman, for the defendant.

**THE COURT:**  All right.  Thank you, Mr. Clarida.

The law in this area seems to be evolving.  And one could argue that there are some seemingly irreconcilable precedents even within the Ninth Circuit, but it does seem to me that under the *Calder versus Jones*, *Schwarzenegger* three-part test, that you have to have an intentional act expressly aimed at the forum state, and which caused harm, the brunt of which is suffered and which the defendant knows likely would be suffered in the forum state.  We all agree on that.

I mean, the question is:  How do you apply that here? And the critical question is:  Is it enough that the defendant knew the plaintiff resides in the forum state?

And, while that may have been sort of indicated in the *Columbia Pictures* case, that just doesn't seem to be the law anymore, you know, after *Schwarzenegger*, for instance; after *Brayton Purcell*; *Pebble Beach*.  The law seems to be

moving towards requiring something more than just knowledge that the defendant -- or the that the plaintiff -- the defendant knew the plaintiff resides in California; but there has to be something like targeting economic competition in this state, or trying to inflict -- knowingly inflicting some kind of -- whatever the nature of the tort is; the harm; whether it's reputational harm or competition harm or some other harm that is related to the nature of the cause of action.

And so it seems like *Brayton Purcell* is sort of more analogous here, because that was a copyright infringement. What was key, it appears, to the Ninth Circuit, was that there was an attempt to compete within the territory of the plaintiff here, through the website; and competing acts for the same potential clients here.

So it seems to me the critical question is:  Is there any evidence here of Ms. Morris deliberately trying to enter this market in the forum state, to the economic harm of the plaintiffs?

And that's where the record is lacking, in my view. At least, that's my tentative view.

I mean, I would accept that there appears to be some evidence that she knew of Lang's residence, but I just don't think that's enough.

Now, if she had a gallery here, if she actively sold/distributed her artwork here, perhaps if she had an active

website that she ran, that's a closer question.  And some day, somebody's going to resolve that, but that also, at least, provides some kind of linkage.

But from what I understand, the facts indicate that, you know, her art is sold through galleries in the United Kingdom -- I think it was -- Germany, and on the East Coast.  And there was the one website that I saw that had posted one of the art pieces; I think I saw it at a Boston gallery.

And I know that one of her -- I guess one of her paintings was found here in a California gallery, I guess, at one point.

**MR. JACOBSON:**  Yes, your Honor.  Down in southern California, I believe.

**THE COURT:**  Right, but she disclaims having any direct knowledge or even knowing this gallery or knowing these people.  And so this was, if anything, a secondary or tertiary sale.  So if that's the case, I read the case law as indicating that that's not enough.

So that's where I ended up, or at least, that's where I tentatively end up.  I'll give you a chance to respond, since that would lead to an inclination of this Court to grant the motion to dismiss for lack of jurisdiction.

**MR. JACOBSON:**  Okay, your Honor.  I'd first like to direct the Court's attention to the two cases that came out

last month -- the *CollegeSource*, and the *Mavrix* case -- neither of which are yet published in the Federal 3d., but they are available on Westlaw.  And both of them were by Judge Fletcher, here, in the Ninth Circuit.

THE COURT:  Mm-hm.

MR. JACOBSON:  I'd also like to direct the Court's attention to another case and that is the *Penguin Group versus American Buddha.*  Very vivid title.  Okay?

And it's actually a pair of cases -- okay? -- in the Second Circuit.  They certified a question to the New York Court of Appeal about jurisdiction in New York about -- about copyright infringement.  And there, the New York Court said the fact that the bundle of rights that come with copyright under 105 of the -- of the copyright code -- okay? -- if -- when one of those is injured, it's the fact of the injury that is important.  Okay?  The injury to, in this case, the plaintiff.

Now, Mr. Clarida's firm represented the plaintiff in that action.  So -- and this is a fairly recent case.

THE COURT:  Is this a Second Circuit case or a District Court case?

MR. JACOBSON:  It's a Second Circuit case, and it's a court of -- New York Court of Appeal case.

THE COURT:  Oh.

MR. JACOBSON:  Okay?

So they certified it to the --

**THE COURT:**  I see.

**MR. JACOBSON:**  -- Court of Appeal.  The Court of Appeal -- 15 -- I'm sorry, 16 New York 3d. 295.  And that was March of this year.  And then the federal court case, 640 F. 3d. 497.  And that's just from May.

**THE COURT:**  Okay.  Which followed the certification.

**MR. JACOBSON:**  Correct.  And basically, you know, you know, transmitted into the federal system.  And then they remanded back to the District Court for determination.

**THE COURT:**  Does that suggest, then, that any time you have a copyright-infringement case, wherever the plaintiff resides, it is a valid forum?

**MR. JACOBSON:**  Yes, I do think it --

**THE COURT:**  Almost a per se rule?

**MR. JACOBSON:**  Yes.  Okay?

**THE COURT:**  How do you square that, then, with *Brayton Purcell*, where, at least in the District Court decision, it actually went that way, relying on the *Columbia Pictures* case; but it seemed to have been narrowed by the Ninth Circuit that seemed to require something more?  Maybe the Ninth Circuit and the Second Circuit see things slightly differently.

**MR. JACOBSON:**  Well, of course, there's a difference in law.

The *Penguin Group* case -- I call it *"American*

*Buddha*."  Whichever -- is based upon New York law and -- in terms of jurisdiction.

However, since California has the perfect jurisdictional statute -- whatever's allowed is allowed -- it can be readily analogized here.  Okay?

And there, the Court focused on the second critical factor that tips the balance in favor of identifying New York as a situs of injury.  Derives from the unique bundle of rights granted to copyright owners.  The Copyright Act gives the owner of copyrighted literary works five rights:  right of reproduction; derivative works; right to distribute; the right to perform the work; and the right to display the work.

Here, hence, a copyright holder possesses an overarching right to exclude others from using this property.

The Court then goes on to say,

"Based upon the multifaceted nature of these rights, a New York copyright holder whose copyright is infringed suffers something more than the indirect financial loss deemed inadequate in *Fantis Foods*."

Okay?

And I think this same situation is here.  Okay?

We allege that Ms. Morris deliberately, willfully infringed upon the rights of our client, by taking his crease patterns --

You know, we're focused just on Mr. Lang at the current time.

**THE COURT:** Sure.

**MR. JACOBSON:** Okay?

-- by taking his crease patterns not once, not twice, not three times, but nine times. Okay? Nine separate sets of crease patterns, with more than ten paintings using those crease patterns. Okay?

She disrupted the -- his right -- his exclusive right to prepare derivative works based upon 105 of the Copyright code. Okay?

By doing that, she deliberately aimed at him. Okay? Practices deliberate availment. And it fits the *Calder* analysis. Okay?

I don't think you need something more, such as jurisdiction -- you know, you know, a gallery appearance or, you know, sales; although, you know, I think that should be something subject to jurisdictional discovery.

**THE COURT:** Well, you know, you've cited -- you mentioned the *CollegeSource* and the *Mavrix* case.

In *CollegeSource*, the Court found that there was -- the defendant had specific specifically targeted California students and schools, and misappropriated materials that were -- that aided in direct competition with the plaintiff in the forum, which seems to be consistent with this having to

find something in addition to just residence.

*Mavrix*, as I understand it -- and there was an active website, with a national viewership directly controlled by the defendant, and that it appealed to/profited from an audience in the forum state.

And that's that second thing I'd imposed, is that if there was an active website, you're really close to the edge there.  It may be that there's a -- you can find from that, that there is an deliberate appeal to and profit from California.

I guess your response is, well, it's almost like copyright.  Copyrights are *sui generis*.  So, given the bundle of rights, it doesn't matter whether there was deliberate competition in this state.  So long as the defendant resides here, and his works were infringed upon, his bundle of rights, I guess, follows him wherever he goes; but that -- I guess I'm trying to square that with the *Brayton Purcell* case, which doesn't seem to say that.

**MR. JACOBSON:**  Well, I think the *Brayton Purcell* case -- let me switch to it here.  You know, you -- and let me first stipulate the Court knows it far better than I do.

**THE COURT:**  Well, I know the lower-court decision, but --

**MR. JACOBSON:**  But you know, the Court does emphasize that something more than mere foreseeability is required.

Okay?

But we went past foreseeability -- okay? -- when it's directed straight at Mr. Lang.  Okay?

You copy not only from his book, Origami Design Secrets, but also from his website, which also says, you know, I'm in California; you ought to know that I'm in California; if we're -- if we're going to have a problem, it's going to be in California.  Okay?

**THE COURT:**  Yeah.  I'm assuming from the motion she may well have known where he resides, because of the various --

**MR. JACOBSON:**  Okay.

**THE COURT:**  -- because of the various websites and the fact that it was in the newspaper article.  That was mentioned as well.  The question is whether that, alone, is legally sufficient in this case, or whether you need that sort of directed competition in a local market.

**MR. JACOBSON:**  Okay.  And I don't think you do, for copyright.  Remember, *CollegeSource* was not a copyright-infringement case.  I honestly don't no why it wasn't a copyright-infringement case, but the sole claim that the Court looked at was something called "misappropriation."  And I don't know if that's misappropriation of trade secrets; misappropriation of something else -- okay? -- but it wasn't copyright infringement.

And the unique rights that the copyright code gives

the copyright holder were not implicated.

Here, we have something different.  We have copyright infringement.  It's clear.  Okay?  That's the only thing that we're alleging, albeit twenty times.  Okay?

It's copyright infringement.  Infringement upon a federal right granted by the copyright code, at 105.  Okay?

It's not this amorphous misappropriation, which -- I honestly don't understand what that is.  Okay?

You know, it could be styled as copyright.  It could be styled as, you know, trade secrets.  I don't know -- okay? -- but for the purposes of the Court's analysis in the*CollegeSource* case -- okay? -- they focused on it as a non-copyright; a non-federal right.  Okay?

When you put in the federal right that is included under the *Penguin Group versus American Buddha* -- okay? -- now, all of a sudden, you have a specific right that's infringed that's been recognized as something unique to the location of the plaintiff.

**THE COURT:**  What about the *Love* case?  Are you familiar with that?

**MR. JACOBSON:**  Good old Mike Love, of The Beach Boys.  Judge Fogel, I think, got in the line,

"Mr. Love wished they were all
California torts."

**THE COURT:**  Ha, ha, ha.  Right.

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

**MR. JACOBSON:**  Okay.  There you've got some -- you know, now you've got international considerations.  Okay?

The rights -- first of all, the right that was infringed was the publicity right under -- what? -- 3333 of the Civil Code.  That's number one.

Number two, the actual infringements did not occur in this country.  Okay?

The cover that Mr. Love's picture was on, was on the cover of a CD that the Court -- I'm sorry -- that the newspaper -- I think it was the *Sun*.  I can't remember.

**THE COURT:**  I can't remember what it is.

**MR. JACOBSON:**  Okay, but they included it with their Sunday edition.  Okay?

And I think, if I recall correctly, the Court said that 18 of them were shipped to California.  Okay?

**THE COURT:**  But it -- wasn't the key -- one of the key reasoning was, again, looking at the place of competition where that took place, and finding that it didn't happen here in the forum?

**MR. JACOBSON:**  I think it does, but I think because the act of competition truly happened in a jurisdiction, you know -- and I have no idea about rights in England, but I -- you know, I don't know if they have a publicity right; but that was -- would be something that would be -- that should be addressed in England, not in California, where the plaintiff

resided.  Okay?  There, you have a whole separate issue of jurisdiction in the first place.  Okay?

You know, if you remember the *Hustler* case, the Court found that there wasn't enough jurisdiction in Vermont, because Vermont only had 10- or 15,000 magazines.

In the *Mike Love* case, it was only 18, total.  Okay?  If there were rights, the rights were primarily violated in another country.

**THE COURT:**  All right.  Let me hear from you, Mr. Clarida.  What's your response to the argument that there was something unique about copyright, given its statutory basis, and the bundle of rights that are afforded under the statute, and therefore, that affects jurisdictional analysis?

**MR. CLARIDA:**  Yes.  Thank you, your Honor.

I'm familiar with the *Penguin Group* case.  My office did represent Penguin Group in that case.

Under the New York long-arm statute, it goes to the issue of the situs of the injury.  It's not the end of the jurisdictional analysis.  It's not saying every time that the copyright owner lives in New York, jurisdiction is proper in New York.  It says, under the multipart case, under the New York long-arm statute, the situs of the injury is in New York on the facts of that case.

And the facts of that case were very different.  That case involved an on-line library that was allowing downloads of

complete literary works:  Upton Sinclair, and translations of Apuleius, and things like that; copyrighted works in their entirety, available for free on the Internet.  And you can download them in New York.  So there's distribution of the copyrighted works in New York from the Internet.

That's a very different case than we have here.  So, on the facts, it's very different.

And the legal analysis is different, because the New York Court of Appeals was only asked the question about where is the situs of the injury in a case like this.

**THE COURT:**  Is the New York long-arm statute comparable to the California --

**MR. CLARIDA:**  It is coextensive with due process.

Also, the opinion says -- if you read the Court of Appeal's decision, it specifically limits the holding very specifically to the facts of case involving literary works downloaded from the Internet.  It's not a broad case about all copyright-infringement claims that give rise to jurisdiction where the copyright owner happens to live in New York.  It's not saying that at all.  And, in fact, it remanded the case for consideration of a lot of other factors as to whether jurisdiction was proper in New York.

**THE COURT:**  Where would, if one were to take the *Penguin Group* case and the situs of the injury analysis and apply it here, would there be an argument that the situs of

injury includes the forum state here in California.?

**MR. CLARIDA:**  Well, I don't think so in our case, because there's no circulation of the material in California.

**THE COURT:**  Well, maybe, but through secondary markets there was.

**MR. CLARIDA:**  Well, but it has to be the acts defendant that placed the work into California.  It can't be -- a defendant can't be held subject to jurisdiction based on the acts of third parties that it doesn't foresee or control.

Also --

**THE COURT:**  Foresee.  Is that -- if the defendant foresees acts of third parties or then land their product within the forum state, is that enough?

**MR. CLARIDA:**  No, it's not, because the requirement is that the conduct be expressly aimed at the forum state.

**THE COURT:**  So it has to be almost an act of an agent, if you're talking about third party?

**MR. CLARIDA:**  A question for --

**THE COURT:**  A third party act will suffice to be imputable to the defendant?

**MR. CLARIDA:**  Right.  We're marking a product nationwide.  That's a different story.  Selling a painting in a gallery in New York City or in -- let alone Berlin or in London.  It's certainly not that -- sort of, the aiming that infringing conduct at the forum state that you had in the -- in

the *Buddha* case -- *American Buddha* case.

Also, the situs of the injury, if it goes to anything, it goes to the third factor of *Calder*, which is causing harm that the defendant knows or should know is likely to be suffered here.  It doesn't go to the express-aiming prong of the analysis.

**THE COURT:**  Let me go back to the third-party question, and the fact that the, you know, art might be found here.  I guess, as one example, how does one of Ms. Morris' paintings find its way?  How might it find its way into a California gallery?  Is it sold originally through one of the three outlets or distribution points, and then somebody buys it, and resells it?

**MR. CLARIDA:**  That would be it, your Honor.  Under the first-sale doctrine in the Copyright Act, once someone acquires a lawfully made copy of a work, they can resell it, and the copyright owner has no control over what happens to it.

**THE COURT:**  So it's not like a distribution network that finds its way here over which she had control.  She sold it, and it's like -- almost like a car, or anything else.  You sell it, and then --

**MR. CLARIDA:**  Or like a used book, your Honor.  If you buy a book in a bookstore, you can bring it back to California with you.  And a used bookstore -- that's not something that the Copyright Act allows the copyright owner to

control, absent some kind of contractual arrangement, obviously.

THE COURT:  All right.  So there are no sales over which she had control, directly, into this state?

MR. CLARIDA:  That's right.  And plaintiffs don't even allege any such control over any of those sales.

THE COURT:  What about that Boston gallery?  And the -- on display one of her paintings?

MR. CLARIDA:  Again, those were works that the gallery acquired through the secondary market.

THE COURT:  She didn't sell it?

MR. CLARIDA:  Sarah Morris did not sell those works to the Boston gallery, and had no connection with the Boston gallery.

THE COURT:  Okay.  Well, Ms. Jacobson, doesn't that seem quite distinct both from the *Penguin* case, and all of the other cases; that she had no dealings -- direct dealings -- with anybody here in the state, and the only way it would have gotten in here -- gotten to this state -- would have been through resales over which she had no control or authority?

MR. JACOBSON:  First of all, this is like a great civil-procedure question.

THE COURT:  Yes, it is.  I've been saying that to my externs.

MR. JACOBSON:  I hope it goes up to my

civil-procedure professor, Willie Fletcher, but --

**THE COURT:**  Seems to take an interest in this area.

**MR. JACOBSON:**  Yes, he does.

Two things about that.

Number one, Ms. Morris make much of the fact in her own declaration that she is an internationally recognized artist.  She is one of the 12 most recognized artists in the world.  Okay?

Last time I checked, you know, "world" includes California.  And it includes Northern District of California.

**THE COURT:**  That means she would be subject to personal jurisdiction anywhere in the world that follows the due-process doctrine of international shoo, including all 50 states, probably Canada, and other places?

**MR. JACOBSON:**  And Guam.

In this particular instance, yes, your Honor, because it's a copyright infringement.  Okay?  The issue here isn't the sale of the artwork.  Okay?  The infringement doesn't occur upon the sale; it occurs upon the publishing, making available to the world, showing it in a gallery, of someone else's protected right; in this case, the derivative work rights of Robert Lang.  Okay?

The international art market is, in fact, international.

Okay?

If we were to do jurisdictional discovery, I would not at all be surprised if fore or five of Sarah Morris' works ended up in dining rooms or conference rooms in the Silicon Valley.  Okay?

**THE COURT:**  Well, that might be.  And we might even stipulate to that, but I think unless you can show that she sold them, either directly or through some controlled agent in Silicon Valley, it would all -- the counter argument would be that it all got there through secondary sales.  So I think the main argument you're making is a legal argument that the mere act of publication --

**MR. JACOBSON:**  Right.

**THE COURT:**  -- wherever it is, inflicts one of the bundle of copyrights held by the copyright holder in his forum state.

**MR. JACOBSON:**  That's right, your Honor.  You know, the injury doesn't occur when the sale is made.  The injury occurs when these are released to the world; when they're published.  Okay?

And whether they're published in New York or California, or, you know, someplace in Maine -- okay? -- the injury occurred to Robert Lang here.  Okay?

Under the *Calder* effects test -- okay? -- under the *Penguin Group*, the injury occurred here, because the right that -- the right that is implicated belongs to Robert Lang.

**MR. CLARIDA:**  If I may, your Honor.

**THE COURT:**  Yes.

**MR. CLARIDA:**  The law in California just simply does not make a special case for copyright infringement.  The *Jackson Browne* case*, Browne against McCain*, the Ohio Republican Party, held not to be subject to personal jurisdiction in California, by virtue of having made a music video using a Jackson Browne song without his consent.  They made that video, posted to YouTube in California; still wasn't sufficient to give rise to jurisdiction, let alone making a video and showing it in a conference room or an art gallery, to make the analogy more precise, in Ohio.  Even posting it to YouTube wasn't sufficient to create jurisdiction.

**THE COURT:**  Can I get response to that?  Why is that dispositive?

**MR. JACOBSON:**  I'm at a slight disadvantage.  I haven't read the *Jackson Browne* case.  I'm familiar with the facts from the election three years ago, but you know, I can't speak as to the details.

**THE COURT:**  Sure.  Well, all right.  I will take the matter under submission.

I will look at the case law once again, but it does seem to me that -- I appreciate your sharpening the focus of the argument, focusing specifically on the copyright.  And I will focus on the copyright case.  I will take a second look at

*"Brayton Purcell II,"* as we call it, as well as the -- and the more recent authorities, and see if there is such an exception.

But for that exception, I think the law is pretty clear. I mean, whether it's misappropriation or one of the other torts that we've been talking about, there seems to be a focus on where -- more than injury, to wherever the plaintiff happens to reside, and that do seem to require either some competitive injury or reputational injury or something in the forum state.

And I guess the question now, as you frame it, is: Is there a different rule? Is there, as it applies to copyright?

I'm somewhat skeptical. I will certainly look that. And I'll look at the *Penguin Group* case.

And so I think, rather than holding a case-management conference, I think we should defer that until I figure out whether I've got jurisdiction, or not.

If not, then obviously, you know, I can move that out.

If I do have jurisdiction, then I've got to hear the motion. And we'll set a status conference at the same time we hear that motion.

**MR. JACOBSON:** Okay. And we'll happily stipulate that. Mr. Clarida doesn't have to fly out here again for the CMC.

**MR. CLARIDA:**  All right.  I would appreciate that, your Honor.  And my client would appreciate that.

**THE COURT:**  That's not a problem.  I appreciate the coöperation.

**MR. CLARIDA:**  Thank you very much.

**MR. JACOBSON:**  Thank you, your Honor.

(At 10:35 a.m. the proceedings were concluded)

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C. 11-01366 EMC, Lang, et al., v. Morris, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Thursday, September 8, 2011